UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| TERRY WALKER, | § | |
| | § | |
| v. | § | CASE NO. 5:02-cv-3 |
| | § | LEAD CASE |
| RENT-A-CENTER, INC., et al. | § | |

| | | |
|---|---|---|
| CHAIM KLEIN, | § | |
| | § | |
| v. | § | CASE NO. 5:02-cv-11 |
| | § | |
| RENT-A-CENTER, INC., et al. | § | |

| | | |
|---|---|---|
| JOHN FARRAR, | § | |
| | § | |
| v. | § | CASE NO. 5:02-cv-42 |
| | § | |
| RENT-A-CENTER, INC., et al. | § | |

**ORIGINALLY NAMED DEFENDANTS' REPLY TO PLAINTIFFS'
RESPONSE TO ORIGINALLY NAMED DEFENDANTS' MOTION TO
DISMISS THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Frank G. Jones
State Bar No. 10883000
Anne M. Rodgers
State Bar No. 17133025
Darryl W. Anderson
State Bar No. 24008694
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77002

Nicholas H. Patton
State Bar No. 15631000
Patton & Tidwell, L.L.P.
4605 Texas Boulevard
P.O. Box 5398
Texarkana, Texas 75505-5398


ATTORNEYS FOR DEFENDANTS RENT-
A-CENTER, INC., J. ERNEST TALLEY,
MITCHELL E. FADEL, ROBERT D. DAVIS,
and MARK E. SPEESE

# TABLE OF CONTENTS

**Page**

Table of Authorities ..........................................................................................................iii

Summary of Argument ....................................................................................................... 1

Argument and Authorities.................................................................................................. 3

1.     Plaintiffs' Impermissibly Seek to Lower the Standard of Review for Their Claims..................................................................................... 3

2.     Plaintiffs' Fraud Allegations Ignore RAC's Consistent Accounting Practices Before, During, and After the Class Period, and Fail to Link the Revelation of the "True" Facts to any of Their Alleged Misrepresentations .................................................................................... 4

3.     Plaintiffs' Individual Allegations of Misstatements Fail .......................... 6

      A.     Allegations of Under-Reporting of Expenses Fail to State a Claim ................................................................................................. 6

            i.     Plaintiffs' Response Fails to Demonstrate How "Free Time" Made RAC's Financial Statements Fraudulent ........................................................................ 6

            ii.     Plaintiffs' Allegations of Other Alleged Means of Under-Reporting Expenses are Equally Deficient.......... 11

      B.     Plaintiffs' Allegations of Other Lawsuits Contending RAC Failed to Pay Overtime Expenses Fail to State a Claim ............. 12

      C.     Allegations Related to the "Keystroke Closeout" Fail to State a Claim................................................................................ 16

4.     Plaintiffs' Scienter Allegations Fail as a Matter of Law......................... 16

      A.     Plaintiffs Have Not Alleged Actual Knowledge......................... 16

      B.     Plaintiffs Alleged No Facts Giving Rise to a Strong Inference of Scienter................................................................... 18

5.     Analyst Reports Are Not a Basis for Liability......................................... 19

Conclusion and Prayer .................................................................................................... 20

# TABLE OF AUTHORITIES

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
   291 F.3d 336 (5th Cir. 2003) .............................................................................. passim

*Abrams v. Baker Hughes, Inc.,*
   292 F.3d 424 (5th Cir. 2002) ...................................................................................20

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ................................................................................................17

*Ciresi v. Citicorp,*
   782 F. Supp. 819 (S.D.N.Y 1991) ...........................................................................15

*In re Citigroup, Inc. Security Litigation,*
   330 F. Supp. 2d 367 (S.D.N.Y 2004)........................................................................15

*Constantini v. Medical Board of Cal.,*
   No. 93-16926, 1994 WL 419924 (9th Cir. 1994) .....................................................14

*DiLeo v. Ernst & Young,*
   901 F.2d 624 (7th Cir. 1990) .....................................................................................5

*Gebhardt v. ConAgra Foods, Inc.,*
   335 F.3d 824 (8th Cir. 2003) ...................................................................................16

*Huddleston v. Herman & MacLean,*
   640 F.2d 534 (5th Cir. Unit A 1981),
   *aff'd in part, rev'd in part on other grounds* 459 U.S. 375 (1983) ...............................6

*Hutson v. Rent-A-Center, Inc.,*
   209 F. Supp. 2d 1353 (M.D. Ga. 2001) ...................................................................14

*Kapps v. Torch Offshore, Inc.,*
   379 F.3d 207 (5th Cir. 2004) .....................................................................................5

*Nathenson v. Zonagen Inc.,*
   267 F.3d 400 (5th Cir. 2001) ...................................................................................20

*Parnes v. Gateway 2000, Inc.,*
   122 F.3d 539  (8th Cir. 1997) ..................................................................................16

*Radaszewski v. Maram,*
   383 F.3d 599  (7th Cir. 2004) ..................................................................................14

*Southland Security Corp. v. INSpire Insurance Solutions Inc.,*
   365 F.3d 353 (5th Cir. 2004) ...............................................................................2, 21

# TABLE OF AUTHORITIES

*In re Triton Energy Ltd. Securities Litigation*,
  No. 5:98-CV-256, 2001 WL 872019 (E.D. Tex. Mar. 30, 2001) ........................12, 13

*Vess v. Ciba-Geigy Corp.*,
  317 F.3d 1097 (9th Cir. 2003)  .....................................................................................5

*In re Universal Access, Inc.*,
  209 F.R.D. 379 (E.D. Tex. 2002) ..............................................................................21

## SUMMARY OF ARGUMENT

The PSLRA, Rule 9, and Fifth Circuit precedent unflinchingly demand that a securities fraud complaint meet certain specific criteria before a court can permit the case to proceed to the discovery stage.  Plaintiffs' Third Amended Complaint, like their previous iterations, falls well-short of those criteria.  Plaintiffs' serial attempts to lower the pleading bar should not be credited.  Nor should the Court be lured into complacency by their persistent characterization of their complaint as "detailed."  "Length" or heft, as RAC pointed out in its opening brief, does not translate to substance.  *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) ("prolix . . . garrulous style is not an uncommon mask for an absence of detail").

It is no accident that plaintiffs' response begins by defending the Complaint as consistent with Rule 11 and defending plaintiffs' attorneys as having previously brought meritorious securities fraud claims.  According to plaintiffs, this Court ***should*** dismiss their complaint if the Court believes that they violated Rule 11 by filing the complaint.  But, mere compliance with Rule 11 does not insulate any pleading, much less a securities complaint subject to heightened pleading requirements, from dismissal.  Even if the Complaint is not so frivolous as to be sanctionable, it remains legally baseless and subject to dismissal.  Moreover, plaintiffs cannot avoid dismissal merely because plaintiffs' counsel have previously filed successful securities claims having nothing to do with this case.  Response at 3 n.1.  Unlike the PGA tour, there is no automatic entry based on past success, although it is entirely understandable why plaintiffs would want one here.

As shown in RAC's motion and confirmed below, plaintiffs failed to cure the pleading defects that led to the previous dismissals of their prior complaints.  The supposedly "detailed" facts trumpeted throughout plaintiffs' response are either affirmatively proven to be untrue, contradicted by the financial statements themselves, or not relevant to the elements of their

pleaded claims.  For example, plaintiffs' repeated statement that RAC overstated net earnings by 96% (Response at 1, 12-13, 36) is not based on any document or connected to any specific allegation, and is apparently a number plaintiffs pulled out of the air to inflate the supposed seriousness of their claims.  Likewise, plaintiffs' reliance on accounting-related allegations predicated on RAC's "free time" promotions (supposedly a $60 million issue), its alleged deferral of payment of expenses, and the "keystroke closeouts" are misplaced for two reasons: (1) they have no factual substance and/or (2) they have no legal relevance.

Plaintiffs' continued reliance on unadjudicated wage class actions highlights the thinness of their position in this securities fraud case.  First, plaintiffs are not in any position to determine whether these claims have any merit and, respectfully, neither is this Court; indeed, published judicial decisions suggest that the vast majority of the individuals on plaintiffs' list have brought claims with no merit whatsoever.  Second, taken to its logical conclusion, if there is a rash of class action suits against any firm, then the shareholders of that firm could always parlay those untried class action claims into a securities fraud case even before the class actions are adjudicated on the supposition that the allegations (1) will be proven by a preponderance of the evidence to the satisfaction of a fact finder; and (2) the yet-to-be-determined liability should have been disclosed as an actual liability, rather than a claim.  That position has no footing in securities fraud law.  It could also lead to the incongruous and unacceptable result that the class actions are unsuccessful but the securities fraud claim predicated on the class allegations is.

Distilled, this is a case where an issuer revised a previous prediction of earnings, the revised prediction comes true, and subsequently the shareholders complain that the failure to perfectly predict the future constitutes securities fraud.  This case should be dismissed.

**ARGUMENT AND AUTHORITIES**

**1.      Plaintiffs' Impermissibly Seek to Lower the Standard of Review for Their Claims**

Plaintiffs' claims sound in fraud, and are therefore subject to the heightened pleading standards of Rule 9(b) and the PSLRA.  Plaintiffs do not dispute that all of the factual allegations in their Complaint are the basis upon which they plead claims under § 10 of the 1934 Act, and plaintiffs concede that claims of this nature must meet the heightened pleading obligations.  Yet, their discussion of these standards is marked by a complete failure to address the numerous recent Fifth Circuit cases elaborating on this standard.  *Compare* Motion at 21-22, *with* Response at 7-8.  It is true, of course, that plaintiffs are not required to plead "all" facts supporting a claim of fraud, but that is no help to plaintiffs here; plaintiffs assuredly are required to plead "the who, what, when, and where . . . before access to the discovery process is granted," and plaintiffs have failed to do so.  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349 (5th Cir. 2002).

Moreover, because all of plaintiffs' claims sound in fraud, they cannot invoke the more relaxed pleading requirements for independent claims under §§ 11 and 12 of the 1933 Act.  As the Court previously recognized, "when 1933 Securities Act claims are grounded in fraud rather than negligence, Rule 9(b) applies."  Order on Plaintiffs' Motion for Reconsideration at 5.

Plaintiffs contend they have cured this defect in the Third Amended Complaint because their 1933 Act claims are now "wholly independent" of their fraud claims under § 10(b) of the 1934 Act.  Apparently, plaintiffs' argument is that the claims are now "***standalone*** claims and do not rely on ***any*** other allegations in the Complaint."  Response at 9 (emphasis in original).  It is true, of course, in a purely formalistic sense, that plaintiffs have made "standalone" claims under the 1933 Act, in that they have repeated their allegations under the specific causes of action related to the 1933 Act claims.  Complaint ¶¶ 177-203.  But the allegations that are the basis of these claims are substantively identical to the allegations that form the basis of the 1934 Act

- 3 -

claims, as RAC pointed out in its Motion, and plaintiffs do not dispute.  Motion at 48.  In

dismissing the 1933 Act claims, the Court surely envisioned a repleading more substantive than

merely pasting the fraud allegations beneath a new heading.[1]

Moreover, the most recent Fifth Circuit statement on pleading securities claims

emphasizes that even independent claims under the 1933 Act that are not subject to 9(b) and

PSLRA requirements nonetheless must meet a threshold:  "mere conclusory allegations will not

suffice to prevent a motion to dismiss."  *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 210 (5th

Cir. 2004).  *Kapps* also rejects plaintiffs' argument (made with plaintiffs citing a single case

from the Eighth Circuit) that "[m]ateriality is a fact issue not to be taken away from the jury

except in the rarest of cases."  Response at 9.  In *Kapps*, the Fifth Circuit held:  "Appellants

claim that materiality should be a question of fact for the jury, but many Section 11 cases have

been properly dismissed on the pleadings for lack of materiality."  *Kapps*, 379 F.3d at 216.

**2.     Plaintiffs' Fraud Allegations Ignore RAC's Consistent Accounting Practices Before, During, and After the Class Period, and Fail to Link the Revelation of the "True" Facts to any of Their Alleged Misrepresentations**

RAC previously explained that plaintiffs' claims do not even rise to the level of a run-of-

the-mill, inadequately pleaded securities fraud suit.  Motion at 24.  As RAC pointed out, the

ordinary case involves a plaintiff who alleges that a company's disclosure of previously

undisclosed information evidences fraud during the time that the company kept the information

to itself.  *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).  Plaintiffs in this case,

however, point to nothing that RAC did with respect to its financial statements during the alleged

---

[1] Plaintiffs cite *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003), but that case merely holds that a party may allege two different courses of conduct, "some fraudulent and some non-fraudulent conduct."  *Id.*  Here, however, plaintiffs have alleged a "unified course of fraudulent conduct," *id.*, and thus their allegations must be pleaded with particularity, no matter what cause of action heading is placed on the allegations.

Class Period that it did not do both before and after the Class Period.  Although plaintiffs allege that RAC's "scheme unraveled" with an October 8, 2001 press release, nothing in that press release has any connection with the allegations of wrongdoing upon which plaintiffs premise liability.

The October 8 release does not discuss or correct any statements with respect to prior quarters, and certainly does not disclose any additional charges for expenses that should have been taken but were not, such as for additional depreciation, operating expenses, or salary expenses.  Nor does this press release adopt a new method of depreciation.  Quite to the contrary, the October 8 press release relates to *expected* third quarter 2001 earnings *estimates*.  RAC issued the press release to inform investors that, for the then-current quarter, RAC expected that its expenses would be higher than previously anticipated, and therefore, it reduced its earnings estimate.  The drop in price that occurred thereafter, which is the basis of plaintiffs' claims, had nothing to do with the myriad alleged accounting improprieties in previous months.  *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. Unit A 1981) ("The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value."), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375 (1983).

In a 49-page response, plaintiffs never come to grips with this fundamental failing of their Third Amended Complaint.  Plaintiffs claim that RAC failed to fully depreciate rental units, but plaintiffs nowhere dispute that RAC depreciated rental merchandise during the Class Period just as it had before the Class Period, and just as it does to this day.  Plaintiffs claim that RAC deferred operating expenses through a variety of means, but never assert that financial statements subsequent to the Class Period reflects operating expenses incurred during prior quarters.

Plaintiffs claim that RAC failed to take into account overtime expenses, but never assert that financial statements subsequent to the Class Period reflects such expenses (and, as discussed below, significant authority refutes the contention that overtime was owed). Plaintiffs claim that RAC improperly used "keystroke closeouts," but never assert that the customer delinquency rates allegedly inflated by this methodology were not disclosed to investors, much less disclosed subsequent to the Class Period. And continuing its business practices as usual has dramatically increased the value of plaintiffs' shares while this suit has been pending.

Try as they might, plaintiffs simply cannot fit their allegations into the archetypal securities fraud case, in which an appropriately defined class period would begin at the time that undisclosed information should have been disclosed, and continue until the date on which the information was finally revealed to the market. But there is simply no connection here between the information plaintiffs contend was wrongly withheld from the market, thereby designating the beginning of the class period, and the "revealed" information that plaintiffs contend marks the end of the class period. Rather than defining a class period in relation to the times of disclosure of material information, plaintiffs appear to have defined a class period based on nothing more than highs and lows in RAC's stock price. In other words, there are no indicia of an alleged fraud here. Plaintiffs' claims should be dismissed with prejudice.

**3.      Plaintiffs' Individual Allegations of Misstatements Fail**

Analyzed individually, plaintiffs' claims of fraudulent conduct fare no better.

**A.      Allegations of Under-Reporting of Expenses Fail to State a Claim**

**i.      Plaintiffs' Response Fails to Demonstrate How "Free Time" Made RAC's Financial Statements Fraudulent**

Plaintiffs allege that RAC's financials intentionally understated depreciation expenses because RAC allegedly sometimes granted customers a limited period of rent-free usage when

customers entered into rental agreements; the failure to receive rents during the rent-free period resulted in no depreciation expenses being taken during that period.  Plaintiffs contend this decision not to depreciate goods during rent-free periods constitutes a violation of GAAP, and fraudulently understates depreciation expenses, thereby artificially inflating revenues and profits. Plaintiffs provide a table that they say shows that RAC overstated its net earnings by 96% and its operating profit by 37% during the proposed class period.  Response at 12.  Nowhere do plaintiffs offer even the vaguest explanation of where these numbers come from or how they relate to plaintiffs' theory of underreported depreciation expenses.  In fact, the manner of depreciation and the financial statements refute this theory on four separate grounds.

First, plaintiffs' allegation as to "what the person making the misrepresentation obtained thereby," is fatally defective. *ABC Arbitrage*, 291 F.3d at 350.  The theory that plaintiffs posit for why this purported scheme was necessary is "because the Company's recently opened/acquired stores were severely underperforming."  Response at 12.  But this explanation makes no sense.  As RAC's financial statements reveal, in the fall of 2000, RAC opened a grand total of 36 new stores.  In the 1st quarter of 2001, it opened an additional 23.  *See* Exh. B, 2000 10-K, at 2.  Even if these 59 new stores performed well below expectations, the impact on the company as a whole, which had approximately 2,400 stores at the time, would be *de minimis*. Furthermore, RAC's financial statements already disclosed to investors that newly opened stores would perform poorly in initial months of operation.  *See id.* at 10 (warning that "the opening of a new store is generally dilutive to our earnings for a period of six to seven months following its opening").

Second, plaintiffs offer no basis for their claim that RAC's method of depreciation violates GAAP.  It does not.  Plaintiffs do not contest that RAC fully disclosed that it employed

30822178

- 7 -

the "income forecasting method" of depreciation, pursuant to which "merchandise on rent is depreciated in the proportion of rents received to total rents provided in the rental contract." Motion, at Exh. B, at F-8.  Nor do plaintiffs contest that this is a valid method of depreciation or that RAC implemented it as required.[2]  Plaintiffs apparently believe, however, that GAAP requires depreciation to be taken in strict tandem with use of the good, so that any provision of a unit for free rent should result in depreciation costs, even if no revenue is generated.  There is, however, no support for this contention.  *See Gordon v. Commissioner of Internal Revenue*, 766 F.2d 293, 298 (7th Cir. 1985) (rejecting argument of taxpayer asserting depreciation deduction even though no income received that "depreciation must be taken as the asset is wasting or it is lost" and holding that "the income forecast method is a special method which explicitly ties depreciation to income").  Moreover, the accounting principles that plaintiffs cite refute the argument.  FASB states that "[c]onsumption of economic benefits during a period may be recognized **either** directly **or by relating it to revenues recognized** during the period."  FASB Concept No. 5 ¶ 86 (emphasis added).  FASB further explicitly states that "[s]ome expenses, such as **depreciation** . . ., are allocated by systematic and rational procedures to the periods during which the related assets are expected to provide benefits."  *Id.* ¶ 86(c) (emphasis added).

Thus, plaintiffs' conclusory assertion that RAC's depreciation methodology does not comport with GAAP because it does not track actual consumption of the rental unit when it is rented on free time suffers from a fundamental misunderstanding of what GAAP requires.  As the very FASB Concept upon which plaintiffs rely makes clear, all that is required for depreciation is that the methodology employed allocates depreciation in a "systematic and

---

[2] Plaintiffs make the passing statement that RAC's disclosure of its methodology for calculating depreciation is "an issue of fact," Response at 16, but there is no fact issue here.  The publicly filed statements explicitly disclose RAC's methodology, and plaintiffs nowhere contest that RAC uses this methodology.

rational" method.  Plaintiffs do not contend that the income forecasting method employed by RAC fails to meet this standard.  Nor do plaintiffs dispute that RAC used this methodology both before and after the class period.  It was not some drastic departure from standard practices designed to further the alleged scheme.

Third, plaintiffs' theory is refuted by defendants' financial statements themselves.  As RAC explained in its Motion, if plaintiffs' theory that depreciation expenses were underreported were true, the value of RAC's assets reflected in "Merchandise Held for Rent" would necessarily have been inflated.  Motion at 32-33.  As free time increased, the asset value of Merchandise Held for Rent would increase relative to "properly" depreciated assets that were on rent, and the value of RAC's Merchandise Held for Rent as a percentage of total inventory value would necessarily increase.  The financial statements reveal just the opposite; the percentage of Merchandise Held for Rent fell each year from 1999 to 2001.  *See* Motion at Exh. D, 1999 10-K, at F-3 (19.9%); Exh. B, 2000 10-K, at F-3 (18.8%); Exh. C, 2001 10-K, at F-3 (18.7%).

The Response completely ignores this point and offers no explanation of how plaintiffs' theory of liability can account for the decreasing percentage of proportional value in Merchandise Held for Rent.  If assets are overvalued as a result of a failure to recognize appropriate costs when rents are not being paid, then the value of Merchandise Held for Rent must, as a matter of fundamental arithmetic, increase proportionately, but it quite obviously did not.  The reason it did not is that, in fact, the amount of depreciation for a rental unit is unchanged whether or not free time is given.  If, for example, a rental is depreciated at 10% per month on a $100/month rental for 10 months, depreciation is recognized at $10 each month.  On the other hand, if the same rental contract is entered into, but with one month of "free time" at the outset, depreciation will be zero in the first month, but approximately $11/month for the

remaining nine months, resulting in the same total amount of depreciation over the lifetime of the rental contract.

Finally, plaintiffs have failed to address the Court's concern in dismissing plaintiffs' free time allegations previously.  The Court appropriately pointed out that a rent-free period "may also be a legitimate tool to stimulate business" and ordered plaintiffs to "particularize [their] assertion that the business practice of . . . offering 'free time' negatively impacts long-term revenue generation."  Order on Motion to Dismiss at 9.  Plaintiffs' "simple" explanation is that the value of the rental unit is being consumed, and that value cannot be recouped later.  Response at 15-16.  The theory, apparently, is that, if a rental unit has a certain value before it has ever been used, and if that unit is used by someone for free for some period of time, the amount of revenue that can be obtained from that unit is necessarily reduced.  That argument, however, totally misses the Court's point, which was that giving items for "free" (or at discount, for that matter, which would equally be improper under plaintiffs' theory) may "stimulate business," *i.e.*, it positively impacts long-term revenue generation.  Order at 9.[3]  Plaintiffs have not remedied this defect from their prior Complaint.

Plaintiffs assert that their claims survive under this Court's decision in *In re Triton Energy Ltd. Secs. Litig.*, No. 5:98-CV-256, 2001 WL 872019 (E.D. Tex. Mar. 30, 2001).  In *Triton*, however, the issue was whether certain fact-intensive FASB accounting standards had been complied with, or whether the application of those standards had been manipulated to inflate asset values.  *Id.* at *8.  Here, the antecedent question is whether GAAP requires

---

[3] Plaintiffs' argument also wrongly assumes that RAC consumes its rental units until they have no value left, but, as plaintiffs' have alleged, those units are frequently written off with substantial value left, or are purchased by renters at the end of the rental period.  Since the units are not fully consumed when RAC disposes of them, it is incorrect to say that free time negatively impacts the amount of revenue that can be generated even from the particular rental unit at issue.

depreciation to be taken strictly in tandem with use of a rental item, or whether a pre-disclosed, undisputed "systematic and rational" manner of allocation is sufficient.  That question can be answered as a matter of law in favor of RAC.  Indeed, the Court made just such a finding in dismissing plaintiffs' Second Amended Complaint, when it concluded that the use of free time could be a legitimate tool to "stimulate business."  Order at 9.[4]

### ii.   Plaintiffs' Allegations of Other Alleged Means of Under-Reporting Expenses are Equally Deficient

Plaintiffs' effort to assert other means by which RAC allegedly understates expenses, including the contentions that RAC (1) failed to pay bills in order to defer operating costs, and (2) violated SEC Regulation S-K, Item 303 by failing to disclose potential losses as a result of the use of free time, remains futile.  The Response fails to explain how these allegations can support a properly pleaded claim of securities fraud.

Plaintiffs' allegations of deferral of operating expenses by failing to pay bills continues to evince a fundamental misunderstanding of accrual-based accounting, in which expenses are recorded when incurred, not when actually paid.  As the Court previously recognized, the failure to pay bills timely, even if it occurred, had no effect on when those obligations were recognized on the financial reports.  Order at 8.[5]

---

[4] Additional, independent bases exist upon which plaintiffs' claims can and should be dismissed. Plaintiffs have failed to plead their free time allegation sufficiently by not adequately pleading how the failure to account for free time actually affected the financial statements, and by not adequately pleading what was obtained by this supposed fraud.

[5] To the extent the Response now takes the position that unpaid bills were also not accrued during the period incurred, that position is not pleaded in their Complaint and is belied by the publicly filed financial documents in this case.  If such a failure to accrue occurred, there should be a dramatic increase in such costs at a subsequent time, when RAC would have to record both the previously unpaid, un-recorded bills, as well as the then-current bills actually paid or to be paid.  No anomalous operating expenses are evident in the financial statements, and plaintiffs have not contended otherwise.

Nor does plaintiffs' Response do anything to particularize the allegations of a violation of SEC Regulation S-K, Item 303, requiring a company to "describe any known trends or uncertainties" focusing specifically on "material events and uncertainties known to management that would cause reported financial information not be necessarily indicative of future operating results."  As previously explained, RAC's 10-K specifically discloses the risks that plaintiffs cite. Motion at 34.  Moreover, plaintiffs have alleged nothing in the financials subject to the risks that plaintiffs contend should be disclosed.  In the Response, plaintiffs point to RAC's supposedly "false and misleading disclosures of, among other things, the Company's promotional activities and its growth strategy," Response at 22.  But, these are the same promotional activities that plaintiffs contend were not disclosed at all on the previous page.  *Id.* at 21.[6]

**B.     Plaintiffs' Allegations of Other Lawsuits Contending RAC Failed to Pay Overtime Expenses Fail to State a Claim**

As RAC previously explained, plaintiffs' allegations concerning the alleged failure to pay overtime expenses amounts to nothing more than allegations that other individuals have alleged that they were not paid overtime.  Under plaintiffs' theory, there is no need to wait for collateral lawsuits to be resolved; instead, plaintiffs propose that the merits of those claims be litigated here, in the context of a securities fraud suit.  If this were correct, however, once an employee brought wage litigation, especially if brought as a class action, a shareholder would have an automatic right to bring a derivative suit claiming that the company materially underreported its salary expenses.  It would be possible for the shareholders' suit to be resolved first, perhaps finding liability, only to have the wage litigation decided in favor of the company later.

---

[6] In addition, plaintiffs' reliance on the vague theory of a "breakdown of internal controls" gets less specific with each of their filings.  In a footnote, plaintiffs assert that they "have adequately described specific facts as to how such controls were not present or were overridden throughout the Complaint and this response," but plaintiffs do not cite to anything with any specificity whatsoever.

This possibility is no mere law school hypothetical.  The only published judicial decision ruling on an overtime request by an employee of RAC held that the employee was exempt from overtime requirements.  *Hutson v. Rent-A-Center, Inc.*, 209 F. Supp. 2d 1353 (M.D. Ga. 2001), *aff'd*, 2002 WL 1276984 (11th Cir. 2002), *cert. denied*, 537 U.S. 1106 (2003).  The plaintiff in that case, Hutson, worked as both an "Account Manager" and as an "Inside/Outside Manager."  *Id.* at 1355.  In rejecting Hutson's claim, the Court recognized that certain types of employees are statutorily exempt from the overtime pay requirements of the Fair Labor Standards Act, specifically those employees as to whom "the Secretary of Transportation has power to establish qualifications and maximum hours of service. . ." and that Hutson was that type of employee.  *Id.* at 1356 (quoting 29 U.S.C. § 213(b)(1)).[7]

Plaintiffs' list of 659[8] individuals that they purport demonstrates "widespread" failure to pay overtime expenses is riddled with individuals holding what appear to be the exact same job positions as Hutson.  Of the 659 on this list, 472 individuals (72%) were allegedly employed as Account Managers at some point, and 259 individuals (39%) were employed as Inside/Outside Managers.[9]  Moreover, 12 individuals list job titles such as "Driver" or "Delivery" that would

---

[7] The court's holding is no anomaly.  A Hearing Officer for the Texas Workforce Commission has also dismissed a claim for overtime by an RAC Account Manager on the same grounds.  *See* Texas Workforce Comm'n, Appeal No. 02-002176-4-13-0702 (July 25, 2002) (attached as Exhibit A to this Reply).  The Court may properly take judicial notice of this administrative proceeding on a motion to dismiss.  *E.g.*, *Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir. 2004); *Constantini v. Medical Bd. of Cal.*, No. 93-16926, 1994 WL 419924, at *1 (9th Cir. Aug. 11, 1994) (approving taking judicial notice of administrative proceedings on a motion to dismiss).

[8] Plaintiffs cite to "683" individuals in both their Complaint and in their Response, but their Exhibit B lists only 659 names.

[9] The exhibit refers to "IO" positions, which defendants believe are various types of Inside/Outside Managers.  Of the 659 individuals listed, 146 served as both Account Managers and Inside/Outside Managers.

make them exempt as well.  In sum, the vast majority of the individuals cited by plaintiffs are more than likely exempt from eligibility for overtime.  Yet, under plaintiffs' theory, it constitutes securities fraud for RAC not to have included the cost of paying these individuals for overtime -- overtime for which it appears the vast majority are not eligible.

If plaintiffs were correct -- and they are not -- the only way RAC could avoid liability to shareholders when overtime litigation was filed would be if it declared itself guilty before those claims were even adjudicated and reported additional expenses in its financial statements.  *But see In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("federal securities laws do not require a company to accuse itself of wrongdoing"); *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992).  RAC pointed out this fundamental flaw in plaintiffs' legal theory in its motion, Motion at 36, and plaintiffs offer no response whatsoever, other than to assert that their allegations of allegations "must be taken as true at this stage of the litigation."  Response at 24.

Even if plaintiffs' theory of liability could state a claim under the securities laws, plaintiffs' Response fails completely to answer RAC's point that the individual complaints plaintiffs cite are not material as a matter of law.  As RAC explained, just prior to the class period, RAC had 12,554 employees.  Given the volume of turnover in employees, the total number of individuals who worked for RAC during the class period necessarily exceeded that number by a substantial margin.[10]  Yet, the 659 individuals cited by plaintiffs amount to only five percent of 12,554.[11]  Plaintiffs' suggestion that the Court should blithely assume that there

---

[10] The total number of employees is even greater because the time period in which the named individuals were employed greatly exceeds the Class Period alleged in plaintiffs' Complaint.

[11] Plaintiffs wrongly assert that RAC admitted plaintiffs' list of individuals constituted "at least" five percent, Response at 24, when in fact RAC demonstrated that these individuals could not constitute even five percent.

are additional individuals who also allege they were not paid overtime turns the requirements of specificity defined in the PSLRA and Rule 9(b) on their heads (in addition to ignoring that many lawsuits result in judgments for the defendants, as in the *Hutson* decision).  It is plaintiffs' obligation to allege a material effect on RAC's financial statements, and the Court cannot simply accept plaintiffs' assertion that some unalleged number of additional individuals must exist somewhere, and therefore make plaintiffs' allegations material.

Attempting to avoid the conclusion that such a small percentage is immaterial as a matter of law, plaintiffs suggest that the Eighth Circuit's decision in *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997), is inapposite because it involved an overstatement of assets.  Plaintiffs point to a subsequent decision by the same court suggesting materiality should ordinarily be for the jury.  Response at 26 (citing *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003)).  *Gebhardt*, however, does not purport to overrule *Parnes*, but instead applies it.  *Id.* at 829.  Indeed, the court recognized that in *Parnes*, the overstatement of assets was only $6.8 million, whereas ConAgra's alleged overstatement was "roughly forty times as much."  *Id.* Moreover, the court took note in *Gebhardt* that ConAgra had felt its overstatement was sufficiently material that it had issued a press release and filed an amended earnings statements. *Id.* Of course, none of these additional *Gebhardt* factors are present in this case.  There has been no restatement by RAC, and plaintiffs have not even bothered to plead what effect the marginal increase in salary expenses would be if a court were to find the less than 5% of complaining individuals had actually not been paid required overtime.  Plaintiffs cannot use their failure to plead a specific amount as a basis for escaping dismissal of their overtime allegations for immateriality as a matter of law.

C.      **Allegations Related to the "Keystroke Closeout" Fail to State a Claim**

Plaintiffs' attempt to defend their allegations that the so-called "keystroke closeout" procedure had any effect on RAC's financial statements is half-hearted, at best.   As RAC previously explained, customer delinquency rates -- which plaintiffs allege are improperly reduced by virtue of "keystroke closeouts" -- are not reported in any public filings and, therefore, would not be a part of the "total mix" of information available to the investing public.  *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).   Furthermore, since RAC's earnings are based on actual collected revenues, the "keystroke closeout" procedure could not effect the financial statements. Plaintiffs' Response does not refute this, and points to no misstatement in any public filing related to "keystroke closeouts" or delinquency rates.  The claims fail as a matter of law.

4.      **Plaintiffs' Scienter Allegations Fail as a Matter of Law**

A.      **Plaintiffs Have Not Alleged Actual Knowledge**

Plaintiffs claim to have satisfied their burden of alleging actual knowledge of the falsity of alleged statements by relying on a discredited anonymous source and on facially implausible allegations related to a computer information system.   The anonymous source's supposed support of a claim of actual knowledge is insufficient.   First, established law prohibits relying on an anonymous source in this situation.  According to the Fifth Circuit:

> if the other facts, *i.e.*, documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false *and* the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources.

*ABC Arbitrage*, 291 F.3d at 353.  Plaintiffs' anonymous source cannot satisfy either requirement. The only other evidence plaintiffs cite with respect to the anonymous source's claim that RAC and the Individual Defendants had actual knowledge is the computer system, which, as explained

below, is insufficient.  Moreover, plaintiffs' own allegations discredit their anonymous source. Plaintiffs describe their source as "a senior executive who reported directly to defendants Talley and Speese during the Class Period."  It is undisputed that defendant Speese was not employed by RAC during the Class Period, serving only as an outside director.  Complaint ¶ 10.

Plaintiffs also describe their source as "a former RAC senior executive in charge of accounting and operations during the Class Period."  But, other than the CEO (during the alleged Class Period, this was the now-deceased Mr. Talley), there is no position in charge of both "accounting" and "operations."  Motion at Exh. E, Form S-3, at 38-40.  If there were, that person would be above the individuals to whom plaintiffs claim this executive reported.  Because the description of the source is not credible, and because there is no evidence supporting his contention of actual knowledge, the claim cannot be credited.  *ABC Arbitrage*, 291 F.3d at 353.

Second, even if the anonymous "senior executive" could be relied upon, his allegations do not support a claim of actual knowledge.  Claims that defendant Talley had discussions about "inventory write-off methods and inventory depreciation," that Talley and "all the Senior VPs" worked on Saturdays, that Talley said "whatever it takes to get the business on the books," or that defendants Fadel and Speese commented two years after the class period, in 2003, that "most of the business of the stores were carefully orchestrated dog and pony shows," says nothing about whether any particular defendant had actual knowledge that RAC was, as alleged, falsely underreporting depreciation costs and other expenses, falsely failing to pay overtime expenses, and engaging in keystroke closeouts to falsely represent customer delinquency rates.[12]

---

[12] The only other scienter allegation is the claim that the unnamed source told Fadel that the keystroke closeout gave investors "a false impression of the Company."  Response at 31.  But, as explained above, this cannot be true, since the customer delinquency rates that are allegedly affected by the keystroke closeouts are not actually reported to investors, and thus could not give them an impression, false or otherwise, about the company.

Third, plaintiffs' claim of actual knowledge based on the computerized information system fares no better than their anonymous source's discredited allegations.  Plaintiffs describe the massive volumes of information recorded by this system, including, each item in idle and rented inventory, total items on rent, delinquent accounts, information on "every rental purchase transaction," each instance where a customer received "free time" and the reason why, the number of customers for each store, the number of units on rent for each store, the utility costs for each store, salary and overtime costs for each store, and the advertising and marketing costs for each store.  Response at 31-32.  The suggestion that the Individual Defendants reviewed all of this information every single day -- and somehow managed to perform their job functions, too -- is absurd.  And, though plaintiffs seek to leave the impression this is what they've alleged, they ultimately concede in their Response that all they actually allege is that the Individual Defendants reviewed "a written summary of this information every morning."  Response at 32.  The content of the alleged written summary, and whether it includes any of the information upon which plaintiffs base their claims of liability, so that the Individual Defendants could be said to have actual knowledge of the falsity of those items, is nowhere described.  Plaintiffs assert it is "specifically listed" in the Prospectus, but the quoted material to which plaintiffs cite says nothing about any of these items, other than that management reviews a written summary.

### B.      Plaintiffs Alleged No Facts Giving Rise to a Strong Inference of Scienter

None of the additional allegations in the Response gives rise to a strong inference of scienter sufficient to plead plaintiffs' claims.  The fully disclosed sales of stock by Talley and Speese in connection with the public offering are not bases for such an inference.  In fact, those proposed sales were described before plaintiffs' proposed class period even begins, in the April 5, 2001 Form S-3 registration statement filed with the SEC.  *See* Motion at Exh. F, at 3.  Moreover, plaintiffs have no response to the fact that other insiders did not sell their shares at

30822178

this time, a key factor in the Fifth Circuit.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 421 (5th Cir. 2001).[13]

Nor does the fact that plaintiffs have alleged GAAP violations satisfy the strict scienter requirements.  "[T]he mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter."  *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).  Plaintiffs' suggestion that their allegations of GAAP violations are sufficient on their own to support scienter because they deem them "substantial," Response at 36, is contrary to the Fifth Circuit's holding in *Abrams*, and, in light of the deficiencies in the supposed violations of GAAP described above, fails in any event.[14]

**5.     Analyst Reports Are Not a Basis for Liability**

To adequately plead a claim for liability based on analyst statements, the plaintiff must plead with particularity "who supplied the information to the analyst, how the analyst received the information, and how the defendant was entangled with or manipulated the information and the analyst."  *Southland*, 365 F.3d at 373; *see also* Motion at 41.  Plaintiffs have not met this standard, so they simply ignore it.  Even they cannot argue anything more than that they have

---

[13] Plaintiffs' allegation that the timing of the sale is "suspicious" because it took place "within days of the effective date of the offering," Response at 35, is preposterous.  Talley and Speese sold their shares as part of the public offering, as was thoroughly disclosed to the investing public.  *See* Form S-3 Registration Statement, Exh. F to Motion.  There could be no more "open" selling than sales in a public offering.

[14] Plaintiffs' other allegations of scienter also fail.  Plaintiffs still do not explain how, by virtue of the fact that RAC has a hierarchical structure, in which managers report to a smaller number of regional directors who report to a smaller number of senior executives, permits the inference that these executives knew everything going on in every store, or all of the details of costs incurred in individual salaries and the like.  Nor does the fact that individuals have sued for violations of overtime laws mean that executives were severely reckless in not knowing about violations of those laws, when the individuals' complaints have not been resolved.  Lastly, plaintiffs do not proffer a basis upon which to infer findings in a class certification motion for an employment discrimination case as indicative of knowledge of the allegations of fraud underlying plaintiffs' claims.

30822178                                                    - 19 -

alleged that analyst reports contain "misrepresentations [that] were based on statements that had been made to the analysts by RAC or its agents." Response at 39. This is obviously insufficient. Moreover, plaintiffs' problems are compounded because, as RAC pointed out, each of the reports represents itself as being based on the analysts' own independent analysis. "[A]nalysts' statements that reflect their own opinions or forecasts may not be charged to the defendants because the plaintiffs have not sufficiently alleged entanglement and the adoption of such statements by the defendants." *Southland*, 363 F.3d at 374. Once again, plaintiffs simply ignore arguments they cannot refute.[15]

## CONCLUSION AND PRAYER

For these reasons, the Originally Named Defendants respectfully request that the Court dismiss plaintiffs' claims with prejudice and grant the Originally Named Defendants such further relief to which they may be justly entitled.

---

[15] Rather than attempting to explain how their allegations comport with the Fifth Circuit's recent pronouncement on potential liability for analyst statements, plaintiffs rely exclusively on an unpublished decision. *See In re Universal Access, Inc.*, C.A. No. 9:02cv103 (E.D. Tex. Apr. 9, 2004). That court's discussion of this issue is brief, and it is unclear whether plaintiffs' allegations here bear any resemblance to those accepted by Judge Heartfield in that case. It appears, however, that the plaintiffs in that case alleged reliance by the analysts on oral conversations of particular information otherwise unavailable to the general public. In this case, by contrast, there is no such allegation. Plaintiffs instead seek to pin liability on RAC for analyst statements that refer or cite to RAC's publicly filed statements. But, analysts always look at the company's financial statements; if that were sufficient to attribute liability for analysts' statements on an issuer, then issuers would become automatically liable for analyst statements. The Fifth Circuit's limitations on liability for analysts' statements plainly refute an argument, such as plaintiffs', that would lead to such a result.

Respectfully submitted,

/s/ *Nicholas H. Patton*

Nicholas H. Patton
State Bar No. 15631000
Patton, Tidwell & Schroeder, LLP
4605 Texas Blvd. – P.O. Box 5398
Texarkana, Texas 75505-5398
903.792.7080
903.792.8233 [Fax]

Frank G. Jones
State Bar No. 10883000
Anne M. Rodgers
State Bar No. 17133025
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77002

ATTORNEYS FOR DEFENDANTS
RENT-A-CENTER, INC.; MICHAEL CRAIG
TALLEY, MARK ANDREW TALLEY, AND
MATTHEW TALLEY

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this motion was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Fed.R.Civ.P.5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy via facsimile and/or U.S. First Class Mail this 18th day of November, 2004.

/s/ *Nicholas H. Patton*

Nicholas H. Patton

30822178